**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DRC LV VENTURES, LLC, SCOTT SCHROEDER, MARINE PARK INVESTMENTS, LLC, AND GREENWAY FINANCIAL GROUP, LLC,

Plaintiffs,

-against-

IDIN DALPOUR AND MAXBEN HOLDINGS, LLC,

Defendants.

Docket No.: 1:23-cv-07827 (JGLC)

**DECLARATION OF COUNSEL IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

MARSHALL O. DWORKIN, an attorney duly admitted to practice law before the Courts of the State of New York and the Southern District of New York, affirms as follows under penalty of perjury:

1.      I am an attorney at the law firm of Moritt Hock & Hamroff LLP, counsel for Defendants Idin Dalpour and Maxben Holdings, LLC in this action.  I am familiar with the facts set forth herein by virtue of my personal knowledge and/or review of the file maintained in our office and the public record.

2.      Attached hereto as **Exhibit A** is a true and accurate copy of Plaintiffs' September 1, 2023, Complaint filed in this matter.

Date: October 5, 2023

_/s/ Marshall Dworkin_
Marshall O. Dworkin, Esq.

3391849v1

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DRC LV VENTURES, LLC, SCOTT SCHROEDER, MARINE PARK INVESTMENTS, LLC, AND GREENWAY FINANCIAL GROUP, LLC, | **COMPLAINT** |
| Plaintiffs, | 23 Civ. _7827_ |
| -against- | |
| IDIN DALPOUR AND MAXBEN HOLDINGS, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs DRC LV Ventures, LLC ("DRC LV"), Scott Schroeder, Marine Park Investments, LLC ("Marine Park"), and Greenway Financial Group, LLC ("Greenway Financial"), by and through their undersigned counsel, allege as follows:

## INTRODUCTION

1.      This is a case about a profound abuse of trust.  Idin Dalpour cultivated relationships with Aamir Saleem, Ian Russ, and Scott Schroeder for years.  He started as a business connection, built friendships with all three men, and eventually found himself in such a position of trust that Mr. Saleem, Mr. Russ, and Mr. Schroeder invested more than $5 million of their and their investors' money into Mr. Dalpour's businesses.

2.      When those businesses faltered, Mr. Dalpour found himself unable to make good on his obligations.  But rather than admit the truth, Mr. Dalpour exploited his personal relationships with Mr. Saleem, Mr. Russ, and Mr. Schroeder to buy more time.  He made false statements about why he was delayed in paying them back, when he would pay them back, how much he would pay them, where the money was coming from, and what accounts the money would be transferred from. Relying on those false statements, and still (wrongly) trusting Mr. Dalpour, Mr. Saleem, Mr. Russ,

and Mr. Schroeder gave Mr. Dalpour more and more time to pay them what they were owed.  But Mr. Dalpour did not do what he said he would do, and Mr. Saleem, Mr. Russ, and Mr. Schroeder eventually reached the difficult conclusion that Mr. Dalpour had been misleading them all along.

3.      Mr. Saleem, Mr. Russ, Mr. Schroeder, and Mr. Dalpour all invested in each other's various companies and investment projects.  For example, Mr. Saleem and Mr. Russ invested in Mr. Dalpour's company, Maxben Holdings, LLC ("Maxben Holdings"), through their company, DRC LV.  Mr. Schroeder also invested in Maxben Holdings through Greenway Financial. Mr. Schroeder and Mr. Dalpour together invested in Texas real estate ventures sponsored by Mr. Saleem and Mr. Russ through two entities jointly owned by Mr. Schroeder and Mr. Dalpour named SD Texas I, LLC ("SD Texas I") and SD Texas II, LLC ("SD Texas II").  And Mr. Schroeder and Mr. Saleem both loaned funds to River Ridge Partners I, LLC ("River Ridge"), a Michigan-based real estate venture sponsored by Mr. Dalpour — Mr. Saleem through a personal loan and Mr. Schroeder through Marine Park.  Together, Plaintiffs' investments in Mr. Dalpour's various businesses exceeded $5 million.

4.      Maxben Holdings and Mr. Dalpour have failed to repay Plaintiffs as required under several agreements between the parties.  Accordingly, Maxben Holdings and Mr. Dalpour have breached their obligations under agreements governing Plaintiffs' investments.

5.      Mr. Dalpour also committed fraud to keep Plaintiffs from collecting the money he owed them, making misrepresentations to all of the Plaintiffs about when and how they would be repaid that he knew to be false at the time he made them.  Plaintiffs relied on those false statements to their harm by delaying their efforts to collect their money.

6.     With this action, Mr. Saleem, DRC LV, Mr. Schroeder, Marine Park, and Greenway Financial seek compensatory and punitive damages for the harm caused by Mr. Dalpour's breaches and fraudulent conduct, which resulted in at least $5 million in monetary damages.

## THE PARTIES

7.     Plaintiff DRC LV is a corporation incorporated in Delaware and headquartered in Indiana.  DRC LV has two members, Mr. Saleem and Ian Russ.  Mr. Saleem resides in Maryland, and Mr. Russ resides in Indiana.

8.     Plaintiff Scott Schroeder is an individual who resides in New Jersey.

9.     Plaintiff Marine Park is a corporation incorporated in Delaware and headquartered in New Jersey.  Marine Park has two members, Mr. Schroeder, who, as noted above, resides in New Jersey, and his brother, Jeffrey Schroeder, who resides in Virginia.

10.     Plaintiff Greenway Financial is a corporation incorporated in New Jersey and headquartered in New Jersey.  Greenway Financial has two members, Mr. Schroeder and his wife, Jayne Schroeder, both of whom reside in New Jersey.

11.     Defendant Idin Dalpour is an individual who resides in New York, New York.

12.     Defendant Maxben Holdings is a corporation incorporated in Delaware and headquartered in New York, New York.  On information and belief, Idin Dalpour is Maxben Holdings' sole member.

## JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. §1332, as there is complete diversity among Mr. Schroeder and the members of DRC LV, Marine Park, and Greenway Financial, on the one hand, and Mr. Dalpour and the members of Maxben Holdings, on the other.  The amount in controversy exceeds the sum or value of $75,000, excluding interests and costs.

14.     Pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), venue is proper in this District because Maxben Holdings maintains its principal place of business in this District, Mr. Dalpour resides in this District, and substantial part of the events and omissions giving rise to the claims alleged below occurred in this District.

15.     The Court has personal jurisdiction over Mr. Dalpour, as he is domiciled in this District and took actions in this District giving rise to the claims against him in this suit.

16.     The Court has personal jurisdiction over Maxben Holdings, as it is a corporation at home in this State that regularly conducts business in this District and because the company's conduct in connection this action occurred in this District.

## FACTUAL BACKGROUND

### A.     The Parties Meet and Begin to Work Together

17.     In 2020, during the early days of the pandemic, Mr. Saleem and Mr. Russ met Mr. Dalpour.  At the time, among other ventures, Mr. Saleem and Mr. Russ owned and operated a real estate investment firm called Delta Rhino Capital LLC ("Delta Rhino"), and they were looking for investors and investment opportunities.  In or about February 2020, at a dinner they hosted for potential investors in their projects, Mr. Saleem and Mr. Russ met Kishan Alexander, a commercial real estate insurance broker.  Mr. Alexander told them that a company he worked with, OTTE Partners LLC ("OTTE"), might have real estate investment opportunities for Mr. Saleem and Mr. Russ.  Mr. Alexander subsequently introduced Mr. Saleem and Mr. Russ to Mr. Dalpour, who was then an employee of OTTE, and they then began exploring real estate investments sponsored by OTTE.

18.     Over the next few months, Mr. Saleem and Mr. Russ got to know Mr. Dalpour. Mr. Dalpour eventually represented that OTTE might make investments in projects sponsored by

Delta Rhino, and he also sought investments from Delta Rhino in OTTE's projects. The two firms began to work together, with OTTE investing in a Delta Rhino development, and Delta Rhino investing in an OTTE development.

19.     In December 2020, Delta Rhino made its first investment with OTTE in a residential apartment development located in Baltimore, Maryland. The project was sponsored by OTTE and overseen by Mr. Dalpour. Mr. Dalpour told Mr. Saleem and Mr. Russ that an investor had fallen through and that he needed additional equity quickly to facilitate closing. Mr. Saleem and Mr. Russ provided $650,000 in funds from Delta Rhino and other investors on an expedited schedule in time to complete the closing, saving the project for Mr. Dalpour and his employer, OTTE.

20.     Shortly thereafter, Mr. Saleem and Mr. Russ learned that Mr. Dalpour had founded a firm called Maxben Group, LLC ("Maxben Group") through which he planned to develop his own projects. Mr. Dalpour's role at OTTE began to change, and he started partnering with OTTE on investments rather than working as an employee on OTTE's investments. In that new role, Mr. Saleem and Mr. Russ began exploring with Mr. Dalpour the acquisition of a residential community in Houston, Texas.

21.     Mr. Saleem and Mr. Russ agreed to sponsor that project through Delta Rhino, with Mr. Dalpour providing $6.4 million in equity. Roughly thirty days before the closing, however, Mr. Dalpour again ran into difficulty meeting the closing schedule, just as he had with the Baltimore project. Mr. Dalpour, along with one other investor he had brought to the table, eventually provided only $600,000 of the $6.4 million that Mr. Dalpour had said he would deliver. Mr. Saleem and Mr. Russ were forced to rapidly source the remaining capital from their own funds and investors to meet the scheduled closing.

22.     Despite these initial setbacks, Mr. Saleem and Mr. Russ liked Mr. Dalpour.  He spent substantial time with both men, earning their trust and eventually their friendship.  Mr. Saleem and Mr. Russ therefore agreed to consider other investment opportunities with Mr. Dalpour and Maxben Group.

23.     It was around this time, early in 2021, that Mr. Dalpour introduced Mr. Russ to Mr. Schroeder on a video call.  Mr. Schroeder knew the principal of OTTE, Mark Fernandez, and Mr. Schroeder had met Mr. Dalpour while Mr. Dalpour was working for OTTE.  Mr. Fernandez had invited Mr. Schroeder to be a financial partner of OTTE before the pandemic, and Mr. Schroeder had provided financial backing for loans to OTTE.  Mr. Schroeder also invested in real estate projects undertaken by OTTE.

24.     Mr. Russ was interested in working with Mr. Schroeder.  About a month after first meeting Mr. Schroeder through Mr. Dalpour, Mr. Russ introduced his partner, Mr. Saleem, to Mr. Schroeder.  All four men then began discussing investment opportunities together.

**B.     DRC LV Invests in Maxben Holdings**

25.     In or about July 2021, Mr. Dalpour told Mr. Saleem and Mr. Russ about Maxben Holdings, and Mr. Saleem and Mr. Russ began to conduct due diligence on a potential investment in the company, which operated a hospitality business catering to short-term visitors to Las Vegas.  They spoke to Mr. Alexander, who had invested in Maxben Holdings approximately four years earlier, and Mr. Alexander told them that he was pleased with the investment.  According to Mr. Alexander, the company was growing and had provided Mr. Alexander with a high rate of return on his investment.

26.     After further due diligence, Mr. Saleem and Mr. Russ agreed to invest in Maxben Holdings.  They created a new entity, DRC LV, to make the investment, and funded the company with their own money, money from Delta Rhino, and money from other investors.  The investment

6

in Maxben Holdings was structured as a provision of short-term capital in exchange for a set schedule of fixed monthly payments and an agreement to pay back the underlying capital investment at a set date in the future. The agreement was structured in this manner to be consistent with Sharia law, which prohibits interest but permits investments with fixed payment schedules. As a Muslim, Mr. Saleem will only participate in Sharia-compliant investments.

27.     DRC LV made an initial investment of $114,193 in September 2021 and continued to provide additional capital to Maxben Holdings on a monthly basis until May 2022. During that period of time, Mr. Saleem and Mr. Russ were generally pleased with the investment's performance, but all was not perfect. The parties' agreement obligated Maxben Holdings to pay a fixed amount on the fifth of every month. Maxben Holdings never made the payments by the fifth, and the deadline eventually slid to the fifteenth of every month. Even with this additional time, however, Maxben Holdings often missed the deadline set for the fifteenth, and Mr. Saleem and Mr. Russ spent substantial time communicating with Mr. Dalpour about the timing of the payments and the reasons why particular payments were late.

28.     By May 2022, DRC LV had invested more than $4 million in Maxben Holdings. But Mr. Dalpour wanted more capital from DRC LV to continue to grow the business. Before they invested more, Mr. Saleem and Mr. Russ wanted Mr. Dalpour to demonstrate that he could effectively operate Maxben Holdings at the scale to which it had grown with their existing investments. They further wanted Mr. Dalpour to establish a track record of providing the monthly payments on a set and consistent schedule. They thus agreed that Maxben Holdings could make payments by the close of every month, moving the deadline out (again) from the fifteenth, and waited to see how Mr. Dalpour would perform with the additional time.

29.     On May 24, 2022, DRC LV and Maxben Holdings executed a written agreement (the "DRC LV May 2022 Agreement"). The DRC LV May 2022 Agreement memorialized the previous capital payments made by DRC LV and the monthly payments made by Maxben Holdings, which were paid from September 2021 through May 2022. As of May 24, 2022, DRC LV had invested a total of $4,029,960 in Maxben Holdings, and Maxben Holdings' monthly payment was set at $141,048.25.

30.     The DRC LV May 2022 Agreement further provided that Maxben Holdings would pay back all of the capital invested by DRC LV on December 1, 2023, but that DRC LV, upon thirty days' written notice, could demand the repayment of any portion of its capital investment within ninety days of making the investment. Accordingly, if no additional capital payments were made, after August 22, 2022, DRC LV had the ability to demand the return of its full $4,029,960 investment with thirty days' written notice.

31.     At the time, DRC LV did not intend to withdraw any of its capital prior to December 1, 2023. To the contrary, with the additional time to make the monthly payments (the deadline had now been extended from the fifth of every month, where it had started, to the close of every month) and Mr. Dalpour's commitment to prove he could generate consistent payments on a set schedule, Mr. Saleem and Mr. Russ expected they would increase DRC LV's capital contributions to Maxben Holdings later in 2022. But things did not go as planned.

**C.     Mr. Dalpour Fails to Honor His Obligations to Mr. Saleem with Respect to River Ridge**

32.     First, Mr. Dalpour burned significant credibility with Mr. Saleem by immediately botching the payments on a separate personal no-interest loan that Mr. Saleem had provided to Mr. Dalpour in connection with a real estate project called River Ridge. By this time, Mr. Saleem considered Mr. Dalpour a friend as well as a business partner. They socialized together when they

were in the same cities, and they regularly spoke about things other than business, such as their families, their love of the musical *Hamilton*, and their shared passion for professional basketball. Mr. Saleem and Mr. Dalpour also exchanged gifts. For instance, in April 2022, Mr. Saleem learned that Mr. Dalpour was redecorating his office. Mr. Saleem had also recently redecorated his office, and as a gift to Mr. Dalpour, Mr. Saleem purchased and delivered to Mr. Dalpour the same high-value conference room table and video conferencing equipment that he had purchased to outfit his own conference room.

33. As a result, when Mr. Saleem learned in the spring of 2022 that Mr. Dalpour needed funds to complete River Ridge, a real estate investment in Detroit, Michigan, he jumped in to help. Earlier in the year, Mr. Saleem, Mr. Russ, and Mr. Schroeder had traveled to Detroit to inspect the property. Mr. Saleem enjoyed the trip but emerged uninterested in an investment in the property. Nevertheless, he agreed to give Mr. Dalpour $500,000 of his own money on a short-term basis and with no interest to complete the deal, provided he got the funds back by the beginning of June 2022, which was important because he needed the money to make estimated payments on his personal income taxes by June 15, 2022. Mr. Dalpour did not return the $500,000 as promised:

a. On June 10, 2022, Mr. Dalpour messaged Mr. Saleem that he had only $170,000 in his account and that he was waiting on $680,000 that was still owed to him. In the meantime, he said he could only set up a $100,000 wire transfer because of a cap on wire transfers since he had a new account, and that he would continue to send wires until the $500,000 had been repaid. Mr. Dalpour acknowledged that he had not met his commitment to Mr. Saleem and stated that he was "very sorry for the delay."

b. On June 13, 2022, Mr. Dalpour messaged Mr. Saleem again apologizing for the unplanned delays and acknowledging that they were problematic for Mr. Saleem. Mr. Dalpour

promised that the rest of the money "will come by much smoother starting tomorrow."

        c.     On June 14, 2022, the day before Mr. Saleem's tax payments were due, Mr. Dalpour messaged Mr. Saleem stating that he had run into a problem with his bank and that he was only able to send $50,000 through his account at that bank, so he was going to send an additional $21,000 through a different bank account. Mr. Saleem received the funds, which allowed him to make a partial tax payment, but he could not make the full payment and, as a result, began accumulating interest on the amount he owed to the government. It took Mr. Dalpour until July 25, 2022, to complete the return of the $500,000 that he had promised to pay back before June 15, 2022. Mr. Saleem ended up paying interest on the taxes he owed the government as a result of Mr. Dalpour's failure to meet his obligations.

        34.     In the spring of 2022, Mr. Dalpour also turned to Mr. Schroeder for emergency help on the River Ridge deal. By this time, Mr. Schroeder had also developed a strong personal relationship with Mr. Dalpour. Going back six months earlier, in October and November 2021, Mr. Schroeder and Mr. Dalpour had agreed to make investments together in real estate ventures in Texas sponsored by Mr. Saleem and Mr. Russ. To that end, Mr. Dalpour and Mr. Schroeder created two entities, SD Texas I and SD Texas II. Mr. Schroeder and Mr. Dalpour were the only two members of SD Texas I, with Mr. Schroeder contributing $500,000 and Mr. Dalpour contributing $400,000 to the company. Mr. Schroeder and Mr. Dalpour were the only two voting members of SD Texas II, with each contributing $250,000 to the company. A third non-voting member contributed another $100,000. All of the capital in both SD Texas entities was invested in Texas-based real estate projects sponsored by Delta Rhino. When profits were distributed to the companies, they were to be distributed to the SD Texas members proportionately with their investments. Mr. Schroeder trusted Mr. Dalpour so thoroughly that he allowed Mr. Dalpour sole

oversight of the companies' bank accounts, believing that if and when profits were paid by Delta Rhino, Mr. Dalpour would give him his share.

35.     As explained below, this was a mistake.  *See infra*, ¶¶ 41-42.  But in the spring of 2022, when Mr. Dalpour came calling about River Ridge, Mr. Schroeder did not know what was to come with the SD Texas entities' investments, and he agreed to loan $665,000 through Marine Park, an investment vehicle he owned with his brother, to Mr. Dalpour to close the River Ridge deal.  Mr. Dalpour promised to return $365,000 within one month, as he did previously with Mr. Saleem's short-term investment, and $300,000 would remain as a longer-term loan to be paid back pursuant to a schedule to be agreed upon.  Mr. Dalpour has paid back none of the money loaned to him by Marine Park.  *See infra*, ¶¶ 136-139.

**D.     Maxben Holdings Fails to Honor Its Obligations to DRC LV**

36.     Despite its agreement in May 2022 to make regular and timely payments from Maxben Holdings to DRC LV, as memorialized in the DRC LV May 2022 Agreement, Maxben Holdings did not make good on its obligations.  In fact, starting immediately with the June 2022 payment, Mr. Dalpour began asking for more time to make Maxben Holdings' payments to DRC LV, and he failed to make nearly every subsequent payment on time:

        a.      On June 24, 2022, Mr. Dalpour messaged Mr. Saleem that the payment due at the end of that month would be delayed and acknowledged fault, stating "[s]orry for the delay in getting investor funds in. I know it messed stuff up on your end."

        b.      On June 29, 2022, Mr. Saleem messaged Mr. Dalpour about the June 2022 payment, and Mr. Dalpour responded "apologies for the delay in getting back to you … Just confirmed the payment is funded and you will see it hit tomorrow morning coming from Maxben

Holdings. If you don't see it by late morning, please let me know. The delay won't happen again."
The June 2022 payment was eventually made, but not until July 2022.

   c.  The July 2022 payment was also delayed.  On July 25, 2022, Mr. Saleem
messaged Mr. Dalpour asking about the "Vegas funds."  Mr. Dalpour replied "[t]his months [sic]
payment will be received on your end by Friday. Next month will most likely be a week late as
well."  The July 2022 payment was eventually made, but again, not on time.

   d.  The August 2022 payment was also delayed.   On August 16, 2022,
Mr. Saleem messaged Mr. Dalpour about the expected timing of the August 2022 payment, and
Mr. Dalpour said that "[t]his month won't be as delayed as last month . . . you can communicate
to investors that you'l lhave [sic] the funds to disburse by the 24th, but receive'll [sic] definitely be
able to beat that."  Mr. Dalpour also promised that "September will undoubtedly go back to a
normal, consistent pay-date of the 15th (+ or– a few days)."

   e.  On August 25 and 26, 2022, Mr. Russ messaged Mr. Dalpour asking about
funds owed.  Mr. Dalpour replied "your investors will receive august [sic] distribution before end
of this month.  I can promise that Sept will bereceivedd [sic] on the 15th (plus/minus a couple of
days like all months except for the last two)."  The August 2022 payment was not made until
September 1, 2022.  Mr. Dalpour acknowledged fault as to the late payment, stating "my apologies
for the inconsistency the last two months."

   f.  The problems continued into the fall of 2022.  On November 21, 2022, after
receiving the September and October 2022 payments late, Mr. Saleem asked Mr. Dalpour to check
on the Maxben Holdings payment for that month.  Mr. Dalpour said he would look into it.  On
November 28, 2022, Mr. Russ messaged Mr. Dalpour to say that he and Mr. Saleem had not
received the distribution.  Mr. Dalpour said he would sort it out and apologized the next day for

the delay. On December 5, 2022, Mr. Saleem messaged Mr. Dalpour saying that they still had not received the distribution and explained that they personally had to cover payments to their own investors. On December 6, 2022, Mr. Dalpour apologized and promised that he would send the funds that week. The November 2022 payment was eventually received, but again, it was late.

37.    The December 2022 payment likewise was not made by the end of December 2022. On December 29, 2022, Mr. Dalpour sent out an email titled "Maxben Holdings LLC Las Vegas Hospitality Portfolio Year-End Updates" in which he raised the possibility of a superseding agreement with his various investors, including DRC LV, wherein some parties would be paid out quarterly and others would continue to receive monthly payments. Given Mr. Dalpour's track record, Mr. Saleem and Mr. Russ decided to stay on a monthly payment schedule. The December 2022 payment was not completed until January 24, 2023.

38.    In 2023, Maxben Holdings did not timely or fully pay any of the monthly payments owed to DRC LV. After substantial back and forth, and many failed promises of payment, Maxben Holdings sent payments in April and May 2023 totaling only $90,000. The payments were not timely, and together they were far short of one full monthly payment ($141,048.25), much less the total amount owed from January 2023 through May 2023.

**E.    Maxben Holdings Fails to Honor Its Obligations to Greenway Financial**

39.    In the summer of 2022, having invested together with Mr. Schroeder in the SD Texas entities and having gotten emergency help from Mr. Schroeder on the River Ridge deal, Mr. Dalpour turned to Mr. Schroeder for still more capital, this time for an investment in Maxben Holdings. Mr. Schroeder liked the investment for the same reason Mr. Saleem and Mr. Russ liked it — it was a bet on the Las Vegas hospitality industry, which was primed for growth as the country emerged from the pandemic, and it had been paying high returns for a long time. Unaware of the

payment delays that Mr. Saleem and Mr. Russ had been weathering, Mr. Schroeder agreed to invest $350,000 in Maxben Holdings.

40.     The investment was memorialized in an August 1, 2022, agreement between Maxben Holdings and Greenway Financial, an investment vehicle owned by Mr. Schroeder and his wife.  The agreement provided for monthly interest of 3.5% to be paid on the thirtieth of every month, for the principal to be returned on August 1, 2023, and for Greenway Financial to have the ability to demand repayment of any portion of the principal upon thirty days' notice (like the DRC LV May 2022 Agreement).  After Maxben Holdings made the initial monthly payment in August 2022, all subsequent monthly payments were either late or never made at all.

## F.     Mr. Dalpour Makes False Statements to Mr. Schroeder to Keep Mr. Schroeder from Collecting the Money He Is Owed

41.     By the beginning of 2023, Mr. Schroeder was exasperated.  Earlier in 2022, he had learned from Mr. Russ that Delta Rhino had made multiple profit distributions to the SD Texas entities, but Mr. Dalpour had not told Mr. Schroeder about them, much less paid Mr. Schroeder his share.  After Mr. Schroeder had confronted Mr. Dalpour about the SD Texas distributions, Mr. Dalpour had told him in December 2022 that he would provide Mr. Schroeder his share of the distributions by the end of the year, which he did not do.  Mr. Schroeder also had not been paid any of the River Ridge loan.  And he had not been paid most of what he was owed on the investment with Maxben Holdings.

42.     Mr. Schroeder began questioning Mr. Dalpour about what had happened to all of the money he was owed, and in a series of email exchanges, Mr. Dalpour led Mr. Schroeder to believe that the money would be repaid, promising him, again and again, and in terms similar to those used with Mr. Russ and Mr. Saleem, that Mr. Schroeder would only have to wait a short while longer before his money was returned:

a.      On February 6, 2023, Mr. Schroeder emailed Mr. Dalpour asking for an update on funding.  Mr. Dalpour replied that the SD Texas funds he owed Mr. Schroeder would be released as soon Mr. Dalpour was able to do so and that River Ridge would pay out that week, with a possibility of payment early the following week.  According to Mr. Dalpour, the funds were held up because Chase had put a ten-business day hold on them.

b.      Mr. Schroeder responded with several questions asking for more specificity.  For River Ridge, Mr. Dalpour claimed he was delayed in paying Mr. Schroeder because he planned to provide funds from a check that he had received on January 20, 2023, and deposited on January 22, 2023, but that Chase had reached out to him to verify the sender because the check was handwritten.  As far as the SD Texas entities' payments were concerned, Mr. Dalpour stated that he would send $55,000 on February 10, 2023, and that this payment was held up because he needed to sell ETFs — exchange-traded funds.  In other words, he needed to liquidate personal investments to pay back money he had stolen from Mr. Schroeder by failing to distribute it to him when it was first paid out by Delta Rhino.  Mr. Dalpour also disclosed for the first time that he had closed the bank accounts for SD Texas II and River Ridge with no notice to Mr. Schroeder, stating: "I closed SD Texas II + RR accounts and will reopen when distributions are scheduled to come in."  Mr. Dalpour did not explain why the accounts had been closed.

c.      On February 14, 2023, Mr. Schroeder reached out again by email because he had not received any payments or any further response from Mr. Dalpour.  Mr. Dalpour ignored him.  On February 20, 2023, having failed to receive a response or payment, Mr. Schroeder followed up with Mr. Dalpour again.  Later that day, Mr. Dalpour answered that he had been ill and that he would send what he could without going to the bank.

d.      On February 28, 2023, Mr. Schroeder told Mr. Dalpour that he had still not

received any funds, which he now needed for other projects.  He also made clear that he was losing confidence in Mr. Dalpour because of his ever-changing promises.  Mr. Dalpour did not make any specific commitments in response, saying instead that he would "scrape as much as [he] can and get [Mr. Schroeder] something every day or two in regard to SD Texas until that's paid off[.]"

e.     On March 20, 2023, Mr. Dalpour emailed Mr. Schroeder and claimed that he was still trying to get the money together to pay Mr. Schroeder for River Ridge.

f.     On April 4, 2023, Mr. Schroeder emailed Mr. Dalpour back, stating that he had not heard from him and wanted an update.  He also noted that payment from his investment in Maxben Holdings had not been received in his Greenway Financial bank account.  In response, Mr. Dalpour stated that he had executed ETF sales which would settle within the next two days — again, admitting that he was selling personal holdings to pay Mr. Schroeder rather than using money generated by the Maxben Holdings business.  Mr. Dalpour stated that he would receive $50,000 after the markets closed, that Mr. Schroeder should see that money the next day, and that this payment would cover a portion of the money owed through SD Texas I.  For River Ridge, Mr. Dalpour stated that he believed his check would clear on April 17, 2023, when he would pay Mr. Schroeder.  He did not explain what had happened to the funds from the personal check that he had previously claimed, back in February, to have been subject to a ten-day hold at Chase.  For Maxben Holdings, Mr. Dalpour alleged the March 2023 distribution had been sent out that same day and the April 2023 distribution would be held up until the following week.

g.     On April 11, 2023, Mr. Schroeder told Mr. Dalpour that the $50,000 had never arrived in his account.  Mr. Dalpour told Mr. Schroeder that he had run into a wire issue and would resend the $50,000.  Mr. Schroeder never received that transfer.

h.     On April 19, 2023, Mr. Dalpour informed Mr. Schroeder that with the

assistance of a new banker at Chase he intended to repay Mr. Schroeder the $365,000 that Mr. Schroeder had lent to River Ridge a year earlier, expecting repayment within one month.  On April 20, 2023, Mr. Dalpour stated that he would pay Mr. Schroeder $365,000 the following week. The payment did not arrive.

      i.     On April 26, 2023, Mr. Dalpour told Mr. Schroeder that he was trying to send $100,000 to Mr. Schroeder for River Ridge by April 28, 2023, and that payments from Maxben Holdings would be made by April 28, 2023, or May 1, 2023.  None of those payments arrived as promised.

      j.     On May 9, 2023, Mr. Dalpour sent Mr. Schroeder a lengthy email discussing his financial entanglements:

      i.     Mr. Dalpour admitted that he made a "serious mistake" when he obtained a personal line of credit secured by his holdings in a number of real estate projects, including his holdings in SD Texas I and SD Texas II, and that he had "provided any bank account info tied to any of the properties" as part of that process.  He used the personal line of credit to make other real estate investments, and eventually could not cover the required interest payments, and the payments made by Delta Rhino to the SD Texas accounts were "restricted until I paid the lines down."  As a result of his "serious mistake," Mr. Dalpour allegedly did not have access to Mr. Schroeder's returns on the SD Texas entities' investments.

      ii.     With respect to River Ridge, Mr. Dalpour stated that, "[a]s it stands now, I'm trying to get a separate credit line against either my condo or wife's trust to pull enough to cover your buyout."  He therefore acknowledged that his previous statements about having access for the funds needed to pay Mr. Schroeder were not accurate.

      iii.     With respect to Maxben Holdings, Mr. Dalpour stated that "there is

no issue with the portfolio or the business," and that his delays in making interest payments were the result of banking issues.

      k.      Following a telephone conversation later that day with Mr. Schroeder, Mr. Dalpour sent another email stating, *inter alia*, that:

          i.      The "[c]urrent SD Texas I funds owed will be paid as I can pay down my line of credit." Mr. Dalpour therefore acknowledged that he had diverted Mr. Schroeder's share of the SD Texas distributions to secure a personal line of credit, and that he would not pay the money owed to Mr. Schroeder until after the line of credit was paid down.

          ii.      He would pay what was owed on River Ridge from the proceeds of a personal loan that he was seeking. Mr. Dalpour therefore acknowledged that he did not have the money to pay Mr. Schroeder any of the River Ridge loan, despite his many previous representations to the contrary. Mr. Dalpour further acknowledged that he had favored Mr. Saleem over Mr. Schroeder when paying back the short-term loans the prior year, and that he should have "at least split the funds I raised btwn [sic] you two." He admitted "I messed up and I don't have an excuse. I simply screwed up[.]"

          iii.      With respect to Maxben Holdings, the "business is doing very well," and the delays in making interest payments were on "the administrative side." More specifically, Mr. Dalpour blamed the delays on his decision to transition the "operating accounts tied to Maxben Holdings and its sub-entities" from Bank of Nevada to Chase.

      l.      On May 16, 2023, Mr. Schroeder emailed Mr. Dalpour about outstanding past due interest payments owed by Maxben Holdings to Greenway Financial. Mr. Dalpour replied "I'll get that payment out to you today. I'll be in touch when it's out."

      m.      On May 17, 2023, Mr. Schroeder emailed that he had not received the

Maxben Holdings interest payments. Mr. Dalpour answered, "This will be in your acct [sic] tomorrow. Sorry for the delay."

n.     On May 22, 2023, Mr. Schroeder emailed Mr. Dalpour that he had still not received the Maxben Holdings payment. Mr. Dalpour did not respond.

o.     On May 24, 2023, Mr. Schroeder emailed Mr. Dalpour that the "Maxben Las Vegas funds have still not hit the account." Mr. Schroeder added that he was "starting to believe there are much larger issues with my Maxben Las Vegas investment." Mr. Dalpour answered that "[t]here is no need to assume there are larger issues with the Vegas Hospitality portfolio," and blamed "[a]ny delay" on "switching banks and bookkeeping teams," as well as "delays in receiving funds from operating partners." Mr. Dalpour further claimed that the Maxben Holdings payment that he had allegedly sent on May 16 should have been received, but that "after checking in with Chase's back office, it seems as if there may be an issue with what I input as your ACH transfer instructions." Mr. Dalpour claimed that he had "mirrored [Greenway's] wire instructions" — ACH transfers are processed over an electronic network between financial institutions, whereas wire transfers are made directly between two banks — and asked Mr. Schroeder to "please let me know if you have different instructions, maybe routing number, for ACH transfers vs Wire transfers." Mr. Dalpour therefore blamed the delay not on his failure to make the transfer in the first place, but on a technical issue at the bank.

**G.     Mr. Dalpour Continues to Make False Statements Through Counsel**

43.     By the end of May 2023, it was clear to Mr. Saleem and Mr. Russ that Mr. Dalpour's many promises were false and misleading, and they were concerned that their entire capital investment was at risk. They elected to demand a capital re-payment, as was their right under the DRC LV May 2022 Agreement.

44.     On June 7, 2023, counsel for DRC LV sent a letter to Maxben Holdings demanding payment by July 24, 2023, of $1,950,000 of DRC LV's capital investment and $615,241.25 in unpaid monthly payments, totaling $2,565,241.25. Maxben Holdings did not make the payment by close of business on July 24, 2023.

45.     On July 25, 2023, counsel for DRC LV sent a letter to Maxben Holdings stating that payment had not been received and that litigation would be initiated if Mr. Dalpour did not pay $2,702,535 (the capital investment demanded on June 7, 2023, plus the accumulated monthly payments due as of July 25, 2023) by close of business on July 27, 2023. On July 26, 2023, Mr. Dalpour's counsel emailed DRC LV's counsel asking to discuss the matter with an aim toward avoiding litigation.

46.     On July 28, 2023, DRC LV and Mr. Dalpour entered into an agreement by which DRC LV agreed not to initiate litigation if Mr. Dalpour posted security and made payments pursuant to a set schedule. Specifically, the agreement required Mr. Dalpour to execute a personal guarantee of Maxben Holdings' debt to DRC LV, convey pledges from Mr. Dalpour's interest in several real estate developments, and make the following payments: $50,000 by July 31, 2023, $200,000 by August 2, 2023, $250,000 by August 8, 2023, $1,266,000 by August 15, 2023, and $936,535 by August 18, 2023.

47.     Mr. Dalpour then provided the personal guaranty, the real estate pledges, and the initial $50,000, but he failed to make any of the remaining payments pursuant to the agreed upon schedule. With respect to the missed payments, Mr. Dalpour represented the following, among other things, through counsel:

        a.     On August 2, 2023, Mr. Dalpour's lawyers wrote that Mr. Dalpour had sold personal securities to make the $200,000 payment due that day and had initiated a wire transfer

from his brokerage account at TD Ameritrade to an account at Chase, from which he intended to make the payment to DRC LV, but that the money had not yet hit the Chase account.

       b.     On August 3, 2023, Mr. Dalpour's lawyers wrote to provide "an update on the status of the $200K payment." They represented, in sum and substance, that they had learned from Mr. Dalpour's "banker at Chase, as well as contacts at TD Ameritrade," that the money had been sent to Wells Fargo, TD Ameritrade's "intermediary bank," and that "we expect those funds to reach Mr. Dalpour's chase [sic] account today in a timely fashion. If so, Mr. Dalpour will immediately initiate a wire transfer of those funds" to DRC LV. Mr. Dalpour's counsel concluded, "While we are frustrated by the delays on this current payment, we believe that this will not be an issue going forward."

       c.     On August 3, 2023, Mr. Dalpour's lawyers wrote: "Mr. Dalpour has informed us that the $200K has still not reached his Chase account yet, though it may still get deposited before the end of the day. Nevertheless, he will not be able to transfer those funds until tomorrow. He has been told that they should arrive in his Chase account no later than tomorrow morning. Either way, he will transfer those funds to your clients immediately."

       d.     On August 4, 2023, Mr. Dalpour's lawyers wrote: "[U]nfortunately, the $200K wire is not going to arrive in Idin's Chase account today. Working with TD Ameritrade and Wells Fargo, Idin was able to locate the wire at Wells Fargo but candidly we do not understand why it was not immediately forwarded to his Chase account. Idin was told by representatives at Wells Fargo and TD that the funds will arrive in his account on Monday [August 7, 2023]."

       e.     On August 7, 2023, Mr. Dalpour's lawyers wrote: "We have been investigating and have now learned that the wire transfer from TD Ameritrade was sent to the wrong Chase account, so Wells Fargo has been sitting on the wire since last week. Today the

transfer was finally deemed rejected and the funds were returned to Mr. Dalpour's TD Ameritrade account. Mr. Dalpour has reinitiated the transfer from TD Ameritrade to the correct Chase account for the $200K wire, and will get the $250K wire transfer sent to the correct Chase account tomorrow since today's investigation delayed that transfer." Mr. Dalpour's lawyers did not explain why Mr. Dalpour's "representatives" at Wells Fargo and TD Ameritrade had previously told Mr. Dalpour that the funds would be transferred to Chase by August 7, 2023, if Mr. Dalpour had provided the wrong Chase account information, demonstrating that this statement was either never made or was inaccurately portrayed by Mr. Dalpour to his counsel.

       f.      On August 8, 2023, Mr. Dalpour's lawyers provided screenshots of sales of personal securities that Mr. Dalpour had allegedly made to satisfy the $250,000 payment that was due that same day, and stated that they were "still waiting for confirmation of funds settling." They did not provide any further update on the $200,000 payment that was originally due on August 2, 2023.

       g.      On August 9, 2023, Mr. Dalpour's lawyers wrote: "We fully expect to be able to show you evidence of the $200,000 wire being sent from Maxben's Chase Account to DRC LV's account tonight – Chase has verbally assured Idin that that transfer will be initiated tonight. In regards to the $250,000, we have been assured by Chase that they are focused on that transfer, as well, and we've been assured that that payment should [be] cleared and Idin should be able to send that payment to DRC LV by EOD Friday [August 11, 2023]." Later that day, in a separate email, Mr. Dalpour's stated: "To follow up on my below email, attached is confirmation of the $200,000 wire that will reach your clients tomorrow [August 10, 2023]." That confirmation showed that the wire transfer was "pending," meaning it had not yet been confirmed by Mr. Dalpour, at which point it would have been listed as "completed."

h.      On August 10, 2023, Mr. Dalpour's lawyers wrote:  "In regards to the $200,000 payment, the wire was actually initiated last night by Mr. Dalpour's banker at Chase. Specifically, Mr. Dalpour escalated the issue surrounding this wire to more senior figures at his Chase bank and it is our understanding that Chase initiated the wire to DRC LV after conducting its own investigation and confirming the presence of the $200,000.  We do not have an explanation as to why that transfer has not been completed yet today, and Mr. Dalpour has been attempting to get information from Chase most of today.  We are all beyond frustrated with the inexplicable delays by Chase in light of their assurances.  Mr. Dalpour has also initiated a transfer of the $250,000 from his TD Ameritrade account to his (correct) Chase account, as well.  We will provide you a confirmation of that transfer, as well."  Later that day, Mr. Dalpour's lawyers sent a screenshot from Mr. Dalpour's TD Ameritrade account purporting to provide "confirmation that Mr. Dalpour has initiated the transfer of the $250,000 from his TD Ameritrade account to his Chase Account."

i.      On August 11, 2023, Mr. Dalpour's lawyers wrote:  "Mr. Dalpour's bank had another internal meeting this morning to discuss his accounts and the delays in his attempt to transfer funds into and out of them.  It is our understanding that there is more progress being made, and these issues continue to be escalated internally at Chase Bank.  One update in the attached is that the $200,000.00 transfer to DRC LV has progressed from 'pending' to 'processing,' so we are optimistic that your clients will receive those funds by the end of the day today or Monday.  We can only relay what we are learning from Chase (which itself has provided inaccurate information on when funds would be available) but Mr. Dalpour and we are working diligently to get these funds released to your clients, and have the remaining funds available for next week."

48.     By August 14, 2023, despite all of these representations, neither the $200,000 payment nor the $250,000 payment had been transferred to DRC LV.

49.     In the meantime, Mr. Schroeder had been separately trying to collect his money from Mr. Dalpour.   In the beginning of August 2023, Mr. Dalpour told Mr. Schroeder that he was securing a loan against the proceeds of a trust for which his wife was a beneficiary, and that he would use this money to pay Mr. Schroeder.   That did not happen, and at the time same time Mr. Dalpour was having his lawyers send the communications described above, he was separately writing Mr. Schroeder the following:

        a.     On August 3, 2023, Mr. Dalpour wrote:  "I will have the trust loan funds next Wednesday, which means I can send them to you on Thursday [August 10, 2023]. This will take out the funds owed for River Ridge ($365,000)."  The funds owed for River Ridge as of August 1, 2023 were in fact $665,000, the original short term loan of $365,000 made in May 2022 that River Ridge had not paid back, and the longer term loan of $300,000, which had not been paid back either.

        b.     Later on August 3, 2023, Mr. Schroeder responded that August 10, 2023 was a "hard deadline" and that, "[i]n the event I do not receive the funds, I will unfortunately have no choice but to take actions to protect my interests."  Mr. Dalpour responded, "I don't think it will come to that, but I completely understand your position. I apologize for how long it's taking to get you repaid and thank you for putting up with the delays."

        c.     On August 4, 2023, Mr. Schroeder emailed Mr. Dalpour asking whether Mr. Saleem had received funds that Maxben Holdings owed to DRC LV.  Later that day, Mr. Dalpour emailed Mr. Schroeder stating that Mr. Dalpour had worked out a repayment schedule with DRC LV.  He also told Mr. Schroeder that, as part of this agreement, he had "provided the

proof of funds from Vegas operations as well which helped avoid legal action" to Mr. Saleem and Mr. Russ. This was false. No such proof was contemplated by Mr. Saleem's and Mr. Russ's agreement, much less produced.

        d.     On August 8, 2023, Mr. Schroeder wrote Mr. Dalpour: "Hi Idin: Just circling back on below. It remains my expectation that I will receive payment of the full $365K you previously stated would be received in my bank account by this Thursday [August 10, 2023] (highlighted below). Please let me know if you need me to send the wire instructions again."

        e.     Mr. Dalpour responded, "Yes, this is still the case. I think i [sic] have the Marine Park Investments wire instructions saved but please send again so I can make sure." Mr. Schroeder then sent the requested wire instructions to Mr. Dalpour.

        f.     On August 10, 2023, Mr. Dalpour did not send $365,000 to Mr. Schroeder. Instead, he wrote: "I had $100,000 of the $365,000 sent due to account limits on the account the trust loan funds were sent into. I've requested a limit increase, but in the meantime, $100,000 is out and you should see this tomorrow. I will send a confirmation. I will send another $100,000 tomorrow and finish it off Monday/Tuesday. I've been in Warwick all week so when I'm back in the city on Monday I should be able to send the remaining $165,000 which will be left at that point. Call me if you have any questions or want to discuss. I have the funds though to get you $365,000 for River Ridge and $100,000 of it is on its way." Mr. Dalpour never sent any of the payments that he falsely promised in this communication.

        50.     On August 11, 2023, Mr. Schroeder informed Mr. Dalpour's lawyers that he too had retained the same counsel that were representing DRC LV and that those lawyers were preparing litigation against Mr. Dalpour.

51. On August 14, 2023, counsel for DRC LV, Mr. Schroeder, and Mr. Schroeder's entities wrote to Mr. Dalpour's lawyers requesting a meeting with counsel and the principals to address Mr. Dalpour's failure to honor his obligations and to attempt one last negotiated resolution before litigation was initiated.

52. On August 16, 2023, the parties met in person. Mr. Dalpour explained, among other things, that he had more than $1 million on deposit in a Chase account, that the money had been frozen due to other litigation, but that he could return that money to the entities that had paid it. He stated that he would then have those entities transfer the money to a new escrow account, from which he would make payments to DRC LV and Mr. Schroeder. Mr. Dalpour further stated that his hospitality counterparties in Las Vegas were paying him roughly $3 million by the end of August 2023, which he would use to pay monies owed by Maxben Holdings to both DRC LV and Greenway Financial.

53. As a result of these representations, as well as other representations Mr. Dalpour made during the meeting, the parties entered into a new agreement under which DRC LV, Greenway Financial and Marine Park agreed not to sue Mr. Dalpour and his entities in exchange for Mr. Dalpour's agreement to, among other things, provide: (a) confirmation that he had $1 million on deposit with Chase; (b) confirmation of the $3 million to be paid by the hospitality companies; (c) a personal guaranty of the amounts owed to Mr. Schroeder and his entities; (d) a pledge to Mr. Schroeder of his shares in SD Texas I and SD Texas II to secure the amounts owed to Mr. Schroeder and his entities; and (e) "all bank statements from 2023 for the account relating to the hospitality portfolio, Maxben Holdings LV Portfolio, LLC (i.e., the operational account from which monies are received and paid out to lenders whose capital is invested in the hospitality business)." Mr. Dalpour further agreed to the following payment schedule with respect to the

amounts owed:  $450,000 to DRC LV by August 23, 2023; $2,202,535 to DRC LV by August 31, 2023; and an amount to be agreed upon with respect to Mr. Schroeder and his entities by August 31, 2023.  The parties subsequently agreed that the amount to be paid to Mr. Schroeder and his entities by August 31, 2023 totaled $1,139,450.50, and that the remaining balances due to DRC LV, Mr. Schroeder, and his entities would be paid by October 16, 2023.

54.     Mr. Dalpour subsequently produced the guaranty, the pledge agreement, confirmation of the $1 million on deposit with Chase, and confirmation that $3 million was owed by the hospitality partners.  Mr. Dalpour did not produce all bank statements from 2023 for Maxben Holdings LV Portfolio.  Mr. Dalpour also failed to satisfy the payment schedule, as follows:

a.     On August 17, 2023, Mr. Dalpour's lawyers stated that "[t]he $200,000 transfer reached the joint CITI account after hours today, and Mr. Dalpour will be transferring those funds directly to DRC LV first thing in the morning."  That is, Mr. Dalpour represented that the $200,000 payment would be made on August 18, 2023, from an account he controlled jointly with his wife.

b.     On August 17, 2023, Mr. Dalpour's lawyers further stated that "[t]he $250,000 arrived back in the TD Ameritrade brokerage account today, and Idin will be transferring those funds to the joint CITI account in the morning, as well.  If the transfer to CITI happens as quickly as the $200K, then we are expecting the transfer of the $250K from CITI to DRC LV to occur on Monday or Tuesday."  That is, Mr. Dalpour represented that the $250,000 payment would be made on August 21, 2023, or August 22, 2023.

c.     The $200,000 payment was not made on August 18, 2023.

d.     On August 21, 2023, Mr. Dalpour's counsel stated that "Mr. Dalpour executed a $100k wire to DRC today.  The confirmation of the wire request is attached.  He will

execute another wire for at least another $100k tomorrow." Later that day, counsel for Mr. Dalpour sent another email stating, "attached please find a screenshot of the confirmation that the $100k wire to DRC has been completed and sent." Counsel added, "[a]s I noted, Mr. Dalpour will be executing another $100k to DRC tomorrow."

e.      On August 21, 2023, DRC LC received a $100,000 wire transfer from a Citibank account in the name of Idin Dalpour.

f.      On August 22, 2023, Mr. Dalpour's counsel sent an email stating "attached please find a screenshot of the confirmation that a $100K wire to DRC has been completed and was sent today."

g.      On August 23, 2023, counsel for DRC LV asked counsel for Mr. Dalpour for an update on the status of the $100,000 wire transfer referenced in the August 22, 2023 email. Counsel responded: "We previously forwarded confirmation that the wire was completed and sent from Mr. Dalpour's CITI account. We don't have or expect to receive any other updates. If the funds don't land in DRC's account by tomorrow evening, we can reach out to CITI."

h.      On August 23, 2023, with respect to the $250,000 wire transfer, Mr. Dalpour's counsel stated: "Mr. Dalpour spoke to both CITI and TD today and realized that he inadvertently ACH'd the funds from TD to CITI, delaying the transfer until tomorrow. He received confirmation from TD that the ACH should land tomorrow since the funds were ACH'd last Friday. When they land into his CITI account he will immediately wire the funds to DRC."

i.      On August 24, 2023, DRC LV received a $50,000 wire transfer from an account in the name of Maxben Development LLC. It was not a $100,000 wire transfer from a joint Citibank account in the name of Mr. Dalpour and his wife, as Mr. Dalpour's counsel had previously represented.

55. DRC LV has received no further wire transfers from Mr. Dalpour or any of his entities.

56. Mr. Schroeder has received none of the money that Mr. Dalpour agreed to pay to him or to his entities.

**COUNT ONE**
**Fraud**
***DRC LV***

57. Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

58. Mr. Dalpour made false and misleading statements to DRC LV, as described above. In particular, since at least January 2023, Mr. Dalpour knowingly made false statements to induce DRC LV to delay its collection efforts and to delay the initiation of this lawsuit, including the statements described above about his ability to make payments, the availability of funds to make payments, and the reasons why payments were not made on the dates they were promised to be made.

59. DRC LV relied on these false statements in delaying its collection efforts and this lawsuit.

60. As a result of Mr. Dalpour's false and misleading statements, DRC LV was damaged in an amount to be determined at trial.

**COUNT TWO**
**Fraud**
***Mr. Schroeder and the Schroeder Entities***

61. Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

62.     Mr. Dalpour made false and misleading statements to Mr. Schroeder and the entities controlled by Mr. Schroeder, as described above.  In particular, since at least January 2023, Mr. Dalpour knowingly made false statements to delay collection efforts by Mr. Schroeder and his entities and to induce Mr. Schroeder and his entities to delay the initiation of this lawsuit, including the statements described above about his ability to make payments, the availability of funds to make payments, and the reasons why payments were not made on the dates they were promised to be made.

63.     Mr. Schroeder and his entities relied on these false statements in delaying their collection efforts and this lawsuit.

64.     As a result of Mr. Dalpour's false and misleading statements, Mr. Schroeder and his entities were damaged in an amount to be determined at trial.

<u>**COUNT THREE**</u>
**Breach of Contract**
***Maxben Holdings and DRC LV***

65.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

66.     DRC LV and Maxben Holdings voluntarily executed the DRC LV May 2022 Agreement, which superseded their prior agreements.

67.     DRC LV performed under the DRC LV May 2022 Agreement by providing Maxben Holdings with $4,029,950 in capital as of May 24, 2022.

68.     Maxben Holdings breached the DRC LV May 2022 Agreement by failing to make monthly payments on the required schedule from June 2022 through December 2022.

69.     Maxben Holdings breached the DRC LV May 2022 Agreement by failing to make monthly payments on the required schedule and in the full amount from January 2023 through the present.

70. Maxben Holdings further breached the DRC LV May 2022 Agreement by failing to return $1,950,000 of DRC LV's capital investment, as required by the DRC LV May 2022 Agreement, given DRC LV's June 7, 2023 demand letter.

71. As a result of Maxben Holdings' breach of contract, DRC LV has been injured in an amount to be determined at trial that includes at least $4,029,950 in capital that DRC LV invested in Maxben Holdings and unpaid monthly payments.

## COUNT FOUR
### Breach of the Covenant of Good Faith and Fair Dealing
### *Maxben Holdings and DRC LV*

72. Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

73. DRC LV and Maxben Holdings entered into the DRC LV May 2022 Agreement.

74. Implied in the DRC LV May 2022 Agreement is a covenant that DRC LV and Maxben Holdings will act in good faith and deal fairly with each other and will not engage in conduct that will destroy the benefits of the contract.

75. Maxben Holdings deprived DRC LV of the benefit of the DRC LV May 2022 Agreement by failing to meet its repayment obligations.

76. As a result of Maxben Holdings' breach of its covenant of good faith and fair dealing, DRC LV has been injured in an amount to be determined at trial that includes at least $4,029,950 in capital that DRC LV invested in Maxben Holdings and unpaid monthly payments.

## COUNT FIVE
### Unjust Enrichment (in the Alternative)
### *Maxben Holdings and DRC LV*

77. Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

78. DRC LV conferred a benefit upon Maxben Holdings by investing $4,029,950 in Maxben Holdings.  Maxben Holdings realized this benefit by using this money to further its business activities.

79. By failing to repay DRC LV monies due under the DRC LV May 2022 Agreement, Maxben Holdings was unjustly enriched.  DRC LV performed services for Maxben Holdings and Maxben Holdings used those services to its benefit without compensating DRC LV.  Maxben Holdings has benefited from DRC LV's services at DRC LV's expense.

80. Under these circumstances, it would be inequitable for Maxben Holdings to fail to reimburse DRC LV's capital investment, while retaining the benefits DRC LV conferred upon Maxben Holdings.

81. If it cannot pursue Count Three or Count Four, DRC LV will have no remedy other than this lawsuit to recover for Maxben Holdings' unjust enrichment.  DRC LV therefore pursues Count Five in the alternative to Counts Three and Four.

82. Maxben Holdings has been unjustly enriched at the expense of DRC LV in an amount to be determined at trial that includes at least DRC LV's $4,029,950 investment in Maxben Holdings.

**COUNT SIX**
**Declaratory Judgment on Personal Guaranty**
***Mr. Dalpour and DRC LV***

83. Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

84. Mr. Dalpour executed a personal guaranty for Maxben Holdings' full debt to DRC LV.

85. Mr. Dalpour agreed that the guaranty may be proceeded upon if Maxben Holdings did not comply with a repayment schedule agreed to by Maxben Holdings and DRC LV.

86.     Maxben Holdings did not comply with the repayment schedule agreed to by the personal guaranty.

87.     DRC LV is entitled to a declaratory judgment that Mr. Dalpour is jointly and severally liable for Maxben Holding's full debt to DRC LV an amount to be determined at trial.

## COUNT SEVEN
### Declaratory Judgment on Pledge and Security Agreement
### *Mr. Dalpour and DRC LV*

88.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

89.     Mr. Dalpour executed a pledge and security agreement pledging his interest in seven limited liability companies as collateral for the amount DRC LV had demanded as of July 31, 2023, which equaled $2,702,535.05.

90.     Pursuant to the terms of the pledge and security agreement, upon default, DRC LV may, among other things, reduce its claim to the pledged property to a judgment and retain that portion of the collateral sufficient to satisfy the payment of the full debt.

91.     Maxben Holdings did not comply with the repayment schedule agreed to by the parties, which constitutes default under the pledge and security agreement.

92.     DRC LV is entitled to a declaratory judgment that the pledged property is owned by DRC LV.

## COUNT EIGHT
### Breach of Contract
### *Maxben Holdings and Greenway Financial*

93.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

94.     Greenway Financial and Maxben Holdings voluntarily executed the August 1, 2022 Agreement.

95.     Greenway Financial performed under the Agreement by providing Maxben Holdings with $350,000 in capital.

96.     Maxben Holdings breached the Agreement by failing to make monthly payments on the required schedule from August 2022 through August 2023.

97.     As a result of Maxben Holdings' breach of contract, Greenway Financial has been injured in an amount to be determined at trial that includes at least $350,000 in capital that Greenway Financial invested in Maxben Holdings and unpaid interest payments.

**COUNT NINE**
**Breach of the Covenant of Good Faith and Fair Dealing**
*Maxben Holdings and Greenway Financial*

98.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

99.     Greenway Financial and Maxben Holdings entered into the August 1, 2022 Agreement.

100.    Implied in the August 1, 2022 Agreement is a covenant that Greenway Financial and Maxben Holdings will act in good faith and deal fairly with each other and will not engage in conduct that will destroy the benefits of the contract.

101.    Maxben Holdings deprived Greenway Financial of the benefit of the August 1, 2022 Agreement by failing to meet its repayment obligations.

102.    As a result of Maxben Holdings' breach of its covenant of good faith and fair dealing, Greenway Financial has been injured in an amount to be determined at trial that includes at least $350,000 in capital that Greenway Financial invested in Maxben Holdings and unpaid interest payments.

## COUNT TEN
### Unjust Enrichment (in the Alternative)
### *Maxben Holdings and Greenway Financial*

103.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

104.    Greenway Financial conferred a benefit upon Maxben Holdings by investing $350,000 in Maxben Holdings.  Maxben Holdings realized this benefit by using this money to further its business activities.

105.    By failing to repay Greenway Financial monies due under the August 1, 2022 Agreement, Maxben Holdings was unjustly enriched.  Greenway Financial performed services for Maxben Holdings and Maxben Holdings used those services to its benefit without compensating Greenway Financial.  Maxben Holdings has benefited from Greenway Financial's services at Greenway Financial's expense.

106.    Under these circumstances, it would be inequitable for Maxben Holdings to fail to reimburse Greenway Financial's capital investment, while retaining the benefits Greenway Financial conferred upon Maxben Holdings.

107.    If it cannot pursue Count Eight or Count Nine, Greenway Financial will have no remedy other than this lawsuit to recover for Maxben Holdings' unjust enrichment.  Greenway Financial therefore pursues Count Ten in the alternative to Counts Eight and Nine.

108.    Maxben Holdings has been unjustly enriched at the expense of Greenway Financial in an amount to be determined at trial that includes at least Greenway Financial's $350,000 investment in Maxben Holdings.

## COUNT ELEVEN
**Breach of Contract**
***Mr. Dalpour and Marine Park***

109.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

110.    In 2022, Marine Park loaned $665,000 to Mr. Dalpour for use in the River Ridge project.

111.    Marine Park performed under the agreement by providing Mr. Dalpour with $665,000.  A short-term loan in the amount of $365,000 was provided to be repaid within thirty days.  A long-term loan in the amount of $300,000 was provided to be repaid, with interest, at a date to be determined in the future.

112.    Mr. Dalpour breached the agreement by failing to repay the $365,000 short-term loan.

113.    Mr. Dalpour breached the agreement by failing to repay the $300,000 longer-term loan.

114.    As a result of Mr. Dalpour's breach, Marine Park has been injured in an amount to be determined at trial that includes at least $665,000 that Marine Park lent to Mr. Dalpour and unpaid interest.

## COUNT TWELVE
**Breach of the Covenant of Good Faith and Fair Dealing**
***Mr. Dalpour and Marine Park***

115.    Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

116.    In 2022, Marine Park loaned $665,000 to Mr. Dalpour for use in the River Ridge project.

117.    Implied in the loan agreement is a covenant that Marine Park and Mr. Dalpour will

act in good faith and deal fairly with each other and will not engage in conduct that will destroy the benefits of the contract.

118.     Mr. Dalpour deprived Marine Park of the benefit of the loan agreement by failing to meet its repayment obligations.

119.     As a result of Mr. Dalpour's breach of its covenant of good faith and fair dealing, Marine Park has been injured in an amount to be determined at trial that includes at least $665,000 that Marine Park lent to Mr. Dalpour and unpaid interest.

**COUNT THIRTEEN**
**Unjust Enrichment (in the Alternative)**
***Mr. Dalpour and Marine Park***

120.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

121.     Marine Park conferred a benefit upon Mr. Dalpour by lending him $665,000 to be used in the River Ridge project.  Mr. Dalpour realized this benefit by using this money to further its business activities.

122.     By failing to repay Marine Park, Mr. Dalpour was unjustly enriched.  Marine Park performed services for Mr. Dalpour and Mr. Dalpour used those services to its benefit without compensating Mr. Dalpour.  Mr. Dalpour has benefited from Marine Park's services at Marine Park's expense.

123.     Under these circumstances, it would be inequitable for Mr. Dalpour to fail to pay back Marine Park's loan, while retaining the benefits Marine Park conferred upon Mr. Dalpour.

124.     If it cannot pursue Count Eleven or Count Twelve, Marine Park will have no remedy other than this lawsuit to recover for Mr. Dalpour's unjust enrichment.  Marine Park therefore pursues Claim Thirteen in the alternative to Counts Eleven and Twelve.

125.     Mr. Dalpour has been unjustly enriched at the expense of Marine Park in an amount to be determined at trial that includes at least Marine Park's $650,000 loan to Mr. Dalpour.

## COUNT FOURTEEN
### Breach and Enforcement of Personal Guaranty
*Mr. Dalpour and Scott Schroeder*

126.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

127.     Mr. Dalpour executed a personal guaranty to Mr. Schroeder for the payment of $1,439,450.50 for all amounts owed to Mr. Schroeder and/or Greenway and/or Marine Park from Maxben Holdings and/or Mr. Dalpour, including amounts owed in connection with the SD Texas entities.

128.     Mr. Dalpour agreed that the guaranty may be proceeded -upon if he and Maxben Holdings did not comply with a repayment schedule agreed to by him and Maxben Holdings and Mr. Schroeder.

129.     Mr. Dalpour and Maxben Holdings did not comply with the repayment schedule agreed to by the parties.

130.     Mr. Schroeder is entitled to a declaratory judgment that Mr. Dalpour is jointly and severally liable for the payment of $1,439,450.50 for all amounts owed to Mr. Schroeder and/or Greenway and/or Marine Park.

## COUNT FIFTEEN
### Declaratory Judgment on the Pledge and Security Agreement
*Mr. Dalpour and Mr. Schroder*

131.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

132.     Mr. Dalpour executed a pledge and security agreement pledging his interest in SD Texas I and SD Texas II as collateral for an agreement to pay the debts outlined in the personal guaranty that he provided to Mr. Schroeder.

133.     Pursuant to the terms of the pledge and security agreement, upon default, Mr. Schroder may, among other things, reduce his claim to the pledged property to a judgment and retain that portion of the collateral sufficient to satisfy the payment of the full debt.

134.     Mr. Dalpour did not comply with the repayment schedule agreed to by the parties, which constitutes default under the pledge and security agreement.

135.     DRC LV is entitled to a declaratory judgment that the pledged property is owned by Mr. Schroeder.

## COUNT SIXTEEN
### Quantum Meruit
### *Mr. Dalpour and Marine Park*

136.     Marine Park repeats and re-alleges each of the above paragraphs as if fully set forth herein in their entirety.

137.     Marine Park conferred a benefit upon Mr. Dalpour by lending him $665,000 to be used in the River Ridge project.  Mr. Dalpour realized this benefit by using this money to further its business activities.

138.     Mr. Dalpour failed to repay the $665,000 loan.

139.     As a result of Mr. Dalpour's failure to pay, Marine Park has been injured in an amount to be determined at trial that includes at least $665,000 that Marine Park lent to Mr. Dalpour and unpaid interest.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims for which trial by jury is available.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand the Court enter judgment as follows:

A.      For compensatory and punitive damages in an amount to be determined at trial, but in excess of $75,000;

B.      For a declaratory judgment consistent with declaratory relief described in paragraphs 87, 92, 130 and 135 above;

C.      For pre- and post-judgment interest as appropriate;

C.      For all costs and fees incurred in prosecuting this Complaint; and

D.      For such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        September 1, 2023

Respectfully Submitted,

By:     */S/ Peter M. Skinner*
        Peter M. Skinner
        MORRISON & FOERSTER LLP
        250 West 55th Street
        New York, New York 10019
        Telephone: (212) 468-8000
        E-mail: pskinner@mofo.com